KNIGHT v. SOUTHERN PACIFIC CO.

No. 3172.    Decided April 12, 1918.    (172 Pac. 689.)

1. RAILROADS—DUTY TO FENCE—CATTLE GUARDS AND WING FENCES—STATUTES. Under Comp. Laws 1907, section 456x, as amended by Laws 1913, c. 74, requiring a railroad to fence its right of way on both sides of the track, and to provide gates for private crossings, so constructed that they may be easily operated, a railroad is not under duty either to put in cattle guards or to construct wing fences at private farm crossings. (Page 51.)

2. RAILROADS—FENCING—REPAIRS—IMPLIED AGREEMENT. Where a railroad voluntarily constructed wing fences at a private crossing on a farm intersected by its right of way, doing so purely for the owner's convenience, and not pursuant to a statutory duty, it did not also impliedly agree to maintain such fences and keep them in good repair for all time. (Page 52.)

3. DEEDS—COVENANTS—ANTECEDENT CONTRACT. Where a written antecedent option agreement to convey real property is merged into a deed, the grantor ordinarily must rely on the covenants contained

in the deed, and cannot predicate a right of action upon the ante-cedent agreement.[1]   (Page 55.)

4. COVENANTS—RUNNING WITH LAND.  An agreement or covenant on the part of a railroad to maintain and keep in repair wing fences at a private crossing on a farm is limited to the landowner, because it does not run with the land.  (Page 55.)

5. COVENANTS—RUNNING WITH LAND.  A parol agreement in no event runs with the land.  (Page 55.)

6. RAILROADS—KILLING STOCK—FENCING—HORSES OF OTHERS.  Where a railroad made no covenant or agreement to maintain and keep in repair wing fences at a private crossing on a farm of which the owners of horses pastured on such farm could avail themselves, the law imposing no such duty on the railroad, no recovery against it could be had by the owner of the farm for the horses of others killed at the crossing with his own; the owners of such horses hav-ing assigned their alleged causes of action to him.  (Page 55.)

7. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY.  The question of contributory negligence of plaintiff, like that of defendant's original negligence, ordinarily is a question of fact for the jury, and can be disposed of as a question of law only in rare instances, as when the evidence is undisputed, and not conflicting. (Page 57.)

8. RAILROADS—KILLING STOCK—FENCING—CONTRIBUTORY NEGLIGENCE.  The mere fact that a railroad company fails to comply with its statutory duty to fence its right of way where its track passes through the land of others, or in case it has complied with such duty, fails to maintain its fences or keep them in repair, does not render it contributory negligence on the part of the owner of the land to turn his live stock into his fields adjacent to the railroad merely because he knows that it has failed in its duty in con-structing or in keeping the fences in repair, a doctrine which applies to gates at private crossings, where the statute requires the railroad to construct them for the use of the owners.  (Page 57.)

9. RAILROADS—KILLING STOCK—CONTRIBUTORY NEGLIGENCE.  Where the owner of a farm, and the owners of horses pastured on it, were familiar with the defective condition of a wing fence at a private railroad crossing for several months before their horses were killed on the right of way, and were also informed by the railroad's sec-tion foreman that it was not his business to repair the fence, such owner of the farm and owners of horses were guilty of negligence contributing to the death of the horses on the right of way.  (Page 61.)

[1]*Savings & Trust Co.* v. *Stoutt*, 36 Utah, 210, 102 Pac. 865.

10. RAILROADS—KILLING STOCK—PROXIMATE CAUSE. Where a railroad's wing fence at a private crossing was in defective condition, but, if the owner of the land had kept the gates in the fence closed, all of his horses would have been safe, and could not have been killed, and, if some human agency opened the gate, and left it open, it was the act of such third person or agency that made it possible for the horses to get from the pasture onto the railroad's right of way, the negligence of the railroad in failing to keep the wing fence in repair was not the proximate cause of the death of the horses.[2] (Page 61.)

Appeal from District Court of Weber County, Second District; *Hon. A. E. Pratt,* Judge.

Action by William Knight against the Southern Pacific Co.

Judgment for plaintiff. Defendant appeals.

REVERSED and cause remanded with directions to grant a new trial.

*George H. Smith, J. V. Lyle* and *B. S. Crow* for appellant.

*Skeen & Skeen* for respondent.

FRICK, C. J.

The plaintiff brought this action against the defendant to recover damages for the alleged negligent killing of certain horses. Five causes of action are set forth in the complaint. The first one was for horses killed that were owned by the plaintiff, and the other four causes of action were assigned to him by two of his neighbors and his two sons for the purpose of prosecuting the action. The horses belonging to the two sons and to the neighbors were killed at the same time that plaintiff's horses were killed.

The complaint is too long to be set forth even in substance. It must suffice to say that the complaint is based upon the

[2]*Edgar* v. *Railroad,* 32 Utah, 330, 90 Pac. 745, 11 L. R. A. (N. S.) 738, 125 Am. St. Rep. 867.

theory that the defendant was guilty of negligence in not keeping in good repair a certain wing fence at plaintiff's private farm crossing. It is alleged in the complaint that the defendant had agreed to make and to maintain what in the record is called wing fences at a private subway crossing on plaintiff's farm. The case was tried and submitted to the jury on that theory. No contention was made by plaintiff that the defendant could have avoided the killing of the horses in the operation of its train after they got onto the right of way and track of the defendant, but the case was submitted to the jury upon the theory that defendant's negligence consisted in not maintaining the wing fences as hereinafter explained.

The defendant denied the alleged agreement to maintain fences and its negligence as alleged, and pleaded that plaintiff's own negligence, as hereinafter explained, was the sole cause of the killing of the horses.

There is little, if any, conflict in the evidence, which tended to establish the following facts:

In 1902 the plaintiff entered into an option agreement in writing with the Central Pacific Railroad Company, the predecessor in interest of the defendant, whereby he agreed to sell a strip of ground 100 feet wide through his farm for a right of way for railroad purposes. The option agreement was subsequently merged into a deed. Neither the option nor the deed was produced in evidence by either party, and the evidence is not as clear as is might be respecting the terms of the option agreement. After the option agreement had been entered into the defendant constructed a railroad track upon the right of way aforesaid, and ever since the completion of the railroad has operated the same. The evidence also tended to show that in said option agreement it was provided that the Central Pacific Railroad Company should construct a farm crossing on plaintiff's land with gates in the right of way fences and with cattle guards on the track. Such a crossing was thereafter constructed. About the year 1905 the defendant company removed the cattle guards or pits, as they are called in the evidence, and plaintiff then went to Ogden, where

defendant maintained an office, for the purpose, as he says, of having the farm crossing removed from the place where it was originally placed to another point on his farm, at which point the conditions were such that a subway crossing, that is, one passing through under the railroad track, could be put in. With respect to what was said and done in that regard, the plaintiff, as appears from the bill of exceptions, testified that he went to Ogden and inquired for the defendant's claim agent. He said:

"I was directed to the place where his office was and I went there. He wasn't there. They said the claim agent was in California. There was a man in there who had charge of the office, I don't know who he was. Q. What did you say to him? A. Well, I stated that they had filled up—took out the cattle guards, and the stock was getting—had been damaged some; one or two killed. And they said they was taking them out all along the road, and they wouldn't put them back again. So I proposed that if they would get chains and locks I would lock the gates that went over the tracks, providing they would put in gates under this subway and fence from the main line to the abutments there so that I would have a road from one pasture to the other that stock couldn't get on the track."

In answer to the question of what was done respecting the crossing, plaintiff further said:

"I found it fixed as I requested them to do it. Q. Just tell us how it was fixed. A. Well, the chains were lying there, they had thrown them off of the train, I suppose; anyway, I got them and put them on the gates that went over, and the fences had been cut opposite the runway under there and gates put in and fences from the abutments to the main fence so that I had a clear way under."

The following rough sketch or plat will make clear to the reader what the witness meant in his statements:

The two outside lines on the plat represent the right of way fences. The lines W W W W represent the wing fences leading from the right of way fences to the bridge marked B on the plat. The parallel lines in the center of the plat represent the railroad track, and the lines *g g* represent the gates that were put in the right of way fences on each side of the track.

Plaintiff's farm, which was principally used for pasture, lies on both sides of the track. There was a washout, or what is designated an old arm of the Weber river, which was dry most of the year, over which the bridge, B, was constructed, and which washout constituted the subway spoken of by the plaintiff in his testimony. The plaintiff desired the subway so that in case he opened the gates *g g* his horses could pass under the bridge, B, from one side of his farm to the other.

In answer to his counsel plaintiff further testified:

"Q. I want you to state fully what the substance of your conversation was with the man in that office. A. Well, now, that has been so long ago that I don't remember just what it was, but then they came down there and fixed this gate; it complied with my request from them, and I just let it go; I never paid any more attention. Q. Now, do you remember what you said and what you asked them to do there in the office, upon condition of the closing of the crossing lower down? A. Well, I asked them to make me a runway under there that I could take my stock through and I would lock the other gates up. And they did so; that is, it was done when I went down. Q. How was it done with respect to the manner in which you requested it to be done? A. Well, it was done just as I wanted it done with the fences and the gates."

On cross-examination, with respect to what was said at the

office at Ogden when he went to see the claim agent about changing the farm crossing, the plaintiff further testified:

"No; I didn't make any agreement with them at all. Q. There was no agreement made as to the wing fences? A. I just told this man what I would take for the road over, and when I went down—I didn't know whether he would do it or not; he just took an item of it, and I suppose he reported it, for when I went down it was done. Q. Oh, that is the reason that you said before that you didn't make any agreement. A. Why, no. I say now I didn't make any; that is, they didn't agree with me to do it. I just told them what I would accept for the other (crossing) for taking the pits out of there. * * * Yes; I didn't find the man that was authorized to make any agreement with me. Q. And this man that you talked to was not authorized to make any agreement with you? A. I don't suppose he was. He said he would report. Q. And you didn't talk to anybody else about it, did you? A. No."

The plaintiff further said that about two weeks after he had spoken to the man in the office at Ogden he went to the place where the original crossing had been put in, and found chains lying on the ground with which he fastened the gates that were originally put in the right of way fences.

It was also made to appear that the old or original crossing was not entirely abandoned, but was left so that it could be used in case of high water or in case of other necessity.

It was further shown that plaintiff's two sons and two of plaintiff's neighbors had some horses in plaintiff's pasture which were pastured by him for a stipulated price per month; that some time early in the month of May, 1916, by reason of a freshet or high water which was then prevailing, the support or soil which supported the posts upon which the wires were strung for the wing fences at the point marked *a* on the plat was washed away, and the wing fence, at the point aforesaid, was, by the floating débris in the water, caused to fall over and lie flat on the ground, which left an opening from the subway onto defendant's right of way; that on August 1, 1916, in the nighttime, some time after midnight, plaintiff's horses, together with other horses sued for in this action in

the four assigned causes of action, and which belonged to plaintiff's two sons and two of his neighbors, passed out of the pasture through the south gate, which, by some person unknown, or by some unknown agency, was opened, as indicated on the plat, and the horses passed through said gate and onto the subway, and from thence over the wing fence that was lying flat on the ground onto defendant's right of way and on the track, and some of them were fatally injured, while others were killed outright, by a passing fast freight train loaded with fruit; that the horses were found in the condition just stated next morning by plaintiff's sons, at which time they also found the gate standing ajar as before stated. It was further made to appear that plaintiff and his sons, and perhaps the owners of the other horses, knew just when the high water washed away the soil and caused the fence to fall down; that some time in the month of July, before the killing of the horses, one of the sons spoke to the section foreman of defendant and called his attention to the wing fence at the point marked *a* on the plat; that the foreman told him that it was not the foreman's duty to repair or erect a fence, but that it was the carpenter's duty to build fences; that neither the plaintiff nor any one else thereafter said anything about the fence to any of defendant's employees. Plaintiff also proved by a witness that the defendant, after the year 1905, when the wing fences were put in, made no repairs on them, and that all that was done with respect thereto was to "whitewash" them, the same as all other wing fences along defendant's right of way; that the wing fences were constructed of barbed wire with a board nailed to the posts along the top; that, while defendant put in the wing fences at private crossings along its right of way, it did not maintain all of them in repair. It also appeared that plaintiff lived several miles from the crossing in question, and that one of the sons lived only a short distance from the subway, and he testified that he saw the gates a day or two before the accident, and that they were then closed and in good condition. Both the plaintiff and his sons also admitted that they knew that, if the horses should pass through the gate leading into the subway, in view

that the wing fence was down as aforesaid, the horses would pass onto the railroad right of way, and thus might get injured; that the gates were kept closed to prevent such an occurrence; that when the wing fences were in good condition the gates were at times left open to permit the horses to pass from one side to the other of the track; that both gates were in good repair at the time of the accident; and that the right of way fences and the other three wing fences were all in good condition and repair at that time. The plaintiff also proved that before the bringing of the action the four causes of action were assigned to him by his two sons and the two neighbors aforesaid.

There was some other additional evidence upon the matters hereinbefore referred to, but it is not material to a determination of the case.

After proving the value of the horses, plaintiff rested his case, and defendant's counsel interposed a motion for a nonsuit based upon twenty-one separate grounds. We shall not set forth the grounds of the motion, but shall hereinafter state those that are deemed material, but without specially referring to the grounds of the motion.

The motion was denied, and defendant produced some evidence, which, however, is not material to this controversy.

After the production of the evidence, defendant's counsel requested the court to instruct the jury to return a verdict for the defendant upon practically the same grounds that were urged in the motion for nonsuit. The court refused to so instruct the jury, but submitted the case to them upon the evidence.

Exceptions were saved to all the rulings of the court.

The jury returned a verdict in favor of the plaintiff on all five causes of action. Judgment was duly entered on the verdict, from which defendant prosecutes this appeal.

While many errors are set forth in the original assignment of errors, yet in their brief and oral argument counsel rely on five propositions, and such as are deemed material we shall now proceed to consider.

In view of the circumstances that appear in the record, the

case in some of its aspects is quite peculiar, if not entirely unique. The first proposition argued by defendant's counsel is that this action must fail for the reason that it is predicated upon an alleged contract to construct and maintain wing fences; that no such contract was proved, and hence no right of action was shown. While it may be true, as counsel contend, that plaintiff proved no express contract or agreement on the part of the defendant to construct the wing fences in question, yet it is shown beyond dispute that plaintiff made a request for wing fences of some one in defendant's office at Ogden, and that within about two weeks thereafter, and presumptively in pursuance of the request, gates were put in and wing fences were constructed at the place designated by the plaintiff, and chains were left upon the ground at the old gates so that those might be permanently closed. No other inference is permissible than that the person in the office, whoever he was, reported plaintiff's request, and that the defendant through its employees acted upon the request and put in the gates and wing fences. It is therefore of no consequence that the plaintiff may not have seen any one in authority, or that the person with whom he left the request had no power or authority to enter into an agreement on behalf of the defendant so far as the construction of the gates and the wing fences is concerned. Defendant therefore voluntarily put in the gates in the right of way fences, and likewise voluntarily put the wing fences as requested by the plaintiff. Counsel for plaintiff, however, attempted to prove at the trial that defendant had agreed to maintain and keep in repair the wing fences. In our judgment, however, there is no evidence in the record justifying any such finding. The new gates were put in the right of way fences, and the wing fences were also constructed for the benefit and convenience of plaintiff. Under our statute (Comp. Laws 1907, section 456x, as amended by chapter 74, Laws Utah 1913, p. 117), the defendant was required to fence its right of way on both sides of the track and to "provide gates for private crossings for the convenience of the owners of the land through which the railroad passes; such gates shall be so constructed that they may be easily operated." The

statute therefore imposes no duty upon the defendant either to put in cattle guards or to construct wing fences at private farm crossings. So far as we are aware, all the decisions are to the effect that, where the statute does not impose such a duty, it does not exist. *Fitterling* v. *Mo. Pac. Ry. Co.*, 79 Mo. 504. That case was approved and followed in *Dent* v. *St. L., I. M. & S. Ry. Co.*, 83 Mo. 496. *Pennsylvania Co.* v. *Spaulding*, 112 Ind. 47, 13 N. E. 268. The duty that was imposed upon the defendant by the statute was therefore limited to the construction and maintenance of gates at plaintiff's private crossing. True, the defendant had a perfect right to construct, for the convenience of the plaintiff, cattle guards. It could also put in wing fences at his farm crossing if it felt so disposed. It in fact did put in wing fences at the new subway crossing. Plaintiff's counsel earnestly contend, however, that because the defendant did put in the wing fences, for that reason it was required to maintain them in good repair for all time. If the law had imposed the duty to put in wing fences, no doubt counsel's contention would have much force. Moreover, defendant could have entered into an agreement with the plaintiff whereby, if based upon a sufficient consideration, the defendant could have bound itself to maintain the wing fences and to keep them in good repair notwithstanding the fact that they were voluntarily constructed for plaintiff's benefit and convenience. As already pointed out, it is apparent from plaintiff's own testimony that no express agreement was entered into to that effect. His counsel, however, insist that such an agreement is implied from the fact that the wing fences were in fact put in. With that contention we cannot agree.

There is absolutely nothing in the record to show what the man with whom plaintiff left the request to construct the gates and the wing fences told the employee or agent of the defendant who subsequently ordered the gates and wing fences put in. No doubt, we may assume that the man in the office informed some one of defendant's employees or agents that plaintiff wanted his private crossing changed to the new place, and that he wanted gates and wing

fences put in at the new place. It cannot be assumed or implied, however, that the man plaintiff saw in the office told defendant's employee or agent anything beyond that. Neither does it follow that because the defendant voluntarily constructed the wing fences for plaintiff's convenience it thereby also impliedly agreed to maintain them and to keep them in good repair for all time. This precise question came before the Supreme Court of Indiana in the case of *Evansville, etc., Ry. Co.* v. *Mosier*, 114 Ind. 447, at page 450, 17 N. E. 109, at page 111, where, in passing upon the question, it is said:

"It is contended that, because the railroad company erected the gates and constructed the crossings some fifteen years ago, it impliedly came under a contract to maintain the gates in repair and closed, as if they had not been erected for the appellee's convenience. We do not assent to this view. The evidence shows nothing more than that the crossings and gates were constructed by the railroad company, and that they were used exclusively by the owners of the land. It cannot be implied that the railroad company came under an obligation to keep the gates closed."

Where the duty to construct wing fences is not imposed by law, the duty to maintain and keep them in repair for all time can exist only if it is assumed by contract, and a contract to maintain and keep in repair for all time cannot be implied from the mere fact that the defendant, at plaintiff's request, has voluntarily accommodated him by putting in wing fences at his private farm crossing. The only actual and obvious inference from a transaction such as is shown by the evidence is that, when the defendant acceded to plaintiff's request to change his private farm crossing from the place where it originally was placed to a new place and to put in wing fences at the new place, defendant had discharged its full duty in so far as the wing fences are concerned. With respect to the wing fences the transaction does not differ from any other where one person has through some agency transmitted a request to another and such other person has fully complied with such request by performing the very thing requested. When that is done, however, all men, we think, will agree that no further duty would be imposed on the part of the person

complying with the request unless the law imposed a further duty.

Before passing from this subject, we desire to add that the authorities are to the effect that, where the duty to maintain gates or fences is not imposed by law nor assumed by contract, the failure to maintain or keep in repair gates, cattle guards, or fences voluntarily constructed at private crossings for the convenience of landowners does not constitute actionable negligence. *Chicago, R. I. & P. Ry.* v. *Woodworth,* 1 Ind. Terr. 20, 35 S. W. 238; *Crary* v. *Chicago, M. & St. P. Ry. Co.,* 18 S. D. 237, 100 N. W. 18; *Martin* v. *Chicago, B. & Q. Ry. Co.,* 15 Wyo. 493, 89 Pac. 1025; *Davis Bros. & Burke* v. *Le Flore,* 26 Okl. 729, 110 Pac. 782; *Beasley* v. *New Orleans, etc., Ry. Co.,* 91 Miss. 268, 45 South. 864; *Georgia S. & F. Ry. Co.* v. *Wisenbaker,* 113 Ga. 604, 38 S. E. 956. In *Crary* v. *Chicago, M. & St. P. Ry. Co., supra,* it is held:

"If the railroad company was not required by law to fence its right of way, it is not bound to construct or maintain any such fence, and the fact that it did construct a fence does not estop it from showing that the law did not require the same, and that the plaintiff * * * had no right to assume that, the company would maintain the fence in good repair."

In *Georgia, etc., Co.* v. *Wisenbaker, supra,* it is held:

"There is no law in this state requiring a railroad company to fence its right of way. It follows that there can be no liability for failing to keep in proper repair a fence which it has erected at particular points on its right of way. Hence, when on the trial of an action instituted to recover damages for killing cattle it is admitted by the plaintiff 'that the agents of the railroad company in charge of the train exercised all reasonable diligence to prevent the killing,' no recovery can be had.

"Failure to keep a fence in such condition as will prevent cattle from going upon its right of way does not subject a railroad company to payment of damages for killing cattle thereon by the operation of its trains, unless such killing was negligently done."

Upon principle neither of the foregoing cases is distinguishable from the case at bar in so far as the wing fences are concerned. So far as the gates are concerned, however, as we have seen, the law does impose a continuing duty, but such is not the case respecting the wing fences.

Both upon reason and authority we are of the opinion that defendant's contention that no duty was imposed upon the defendant either by law or contract to maintain and keep in repair the wing fences should prevail.

The next proposition, namely, that in no event is defendant liable upon any one of the four causes of action that were assigned to the plaintiff by his two sons and by the two neighbors, is so clearly related to the proposition we have just discussed that we prefer to consider that at this point.

As we understand plaintiff's counsel, they contend that the defendant is liable upon the theory that the horses included in the four assigned causes of action were all rightfully in plaintiff's pasture at the time of the accident, and  3, 4, that the defendant is liable for the reason that in con-  5, 6, structing the wing fences it, in legal effect, covenanted to maintain and to keep them in good repair for all time, and that such a covenant is in the nature of a covenant ''running with the land.'' By referring to the statement of facts it will be seen that no written agreement or deed containing any covenant was produced. While it is true that plaintiff undertook to prove the contents of the written option agreement to purchase the right of way by the Central Pacific Railroad Company, yet, in view that it was shown that the option agreement was subsequently merged into a deed in which the right of way was conveyed by plaintiff, the district court at the trial correctly held that plaintiff could rely upon the option agreement only for the purpose of showing a consideration for the putting in of the new crossing and the wing fences. In view that the defendant voluntarily did that at the request of the plaintiff, we cannot see how consideration is material. The court's ruling, however, conforms to the doctrine that, where a written antecedent contract to convey real property is merged into a deed, the grantor ordinarily must rely on the covenants contained in the deed and cannot predicate a right of action upon the antecedent contract. *Savings & Trust Co.* v. *Stoutt,* 36 Utah, 210, 102 Pac. 865. Plaintiff must therefore fall back upon the alleged oral agreement to construct and maintain the wing fences. We have already shown that there

was no express agreement to that effect, and that, although the defendant did voluntarily construct the wing fences, no agreement to maintain and keep them in repair can be implied from the latter fact. We have also shown that the law does not impose the duty on the defendant to maintain the wing fences and to keep them in repair. If it be assumed, however, that the granting of the request of the plaintiff to construct the wing fences by the defendant constituted an oral covenant or agreement to maintain them and to keep them in repair, yet such an agreement could not redound to the benefit of the owners of the horses included in the four assigned causes of action, for the reason that such an oral agreement or covenant is limited to the landowner for the reason that it does not run with the land. In this case, however, the owners included within the four assigned causes of action in no event had any interest in plaintiff's land. They merely pastured their horses on his land and paid him therefor the amount stipulated for pasturage. That a parol agreement in no event runs with the land is the effect of the authorities. *Kentucky, etc., Ry. Co. v. Kenney*, 82 Ky. 154; *Pitzner v. Shinnick*, 41 Wis. 676; *Osborne v. Kimball*, 41 Kan. 187, 21 Pac. 163. In the case first above cited it is said:

"It is very clear that a parol agreement to maintain fences does not run with the land, but affects only the parties to the agreement."

In the case of *Pitzner v. Schinnick, supra*, while the court withholds its decision upon the question of whether a parol agreement to maintain fences is good as between the parties, yet it does hold that such an agreement "will not bind grantees or lessees who have not recognized or acted upon it." Indeed, we know of no case which holds that a parol agreement to maintain fences runs with the land. True, counsel for plaintiff cite and rely on *Toledo, etc., Ry Co. v. Burgan*, 9 Ind. App. 604, 37 N. E. 31; *Nelson v. Wilson*, 157 Iowa, 80, 137 N. W. 1048; *Miller v. Chicago, etc., Ry. Co.*, 66 Iowa, 546, 24 N. W. 36; *Siglin v. Coos Bay Co.*, 35 Or. 79, 56 Pac. 1011, 76 Am. St. Rep. 463, and *Congdon v. Central Vt. Ry. Co.*, 56 Vt. 390, 48 Am. Rep. 793, as holding that parol agreements to construct and maintain fences by railway companies, or by ad-

joining landowners, are binding.  A mere cursory reading of the foregoing cases will disclose, however, that the decisions are based upon the fact that the statute imposed the duty to construct and maintain the particular fence in question in those cases, although the agreements between the parties were referred to.  For example, from the case cited from Indiana, *Toledo, etc., Ry. Co.* v. *Burgan,* and from the one cited from Iowa, *Nelson* v. *Wilson,* it is quite clear that the duty to construct and maintain the fences there in question was imposed by statute, and as to the agreements set forth in the complaints in those cases, as the Iowa court (quoting from the case of *Ivins* v. *Ackerson,* 38 N. J. Law, 220) says:

"It (the contract) does not create any new duty, nor does it impose any new burden."

The statements in the Indiana case just referred to are to the same effect.  Such is likewise the effect of the other cases cited by plaintiff's counsel, although not so clearly expressed. It is quite clear, even from plaintiff's cases, that. the duty to construct and maintain fences, unless imposed either by statute or by written agreement, does not run with the land, and is not enforceable by nor for the benefit of strangers to the contract.  It is therefore quite clear from the cases last cited that they do not sustain a recovery under the undisputed facts of the case at bar.  In view, therefore, that the defendant entered into no covenant or agreement to maintain and keep in repair the wing fences of which the owners of the horses included in the four assigned causes of action could avail themselves, and for the reason that the law imposed no such duty upon it, no recovery can be had for the horses included in those causes of action.  Plaintiff's rights as to those horses are precisely the same as are the rights of the owners thereof, and in view that they could not recover in independent actions plaintiff cannot recover.

Counsel for defendant, however, insist that although both of the foregoing propositions were decided in favor of the plaintiff, yet he cannot recover in this action for the reason that he was guilty of contributory negligence as a matter of law.  There is no conflict in the evidence,

and this question must be determined upon the evidence pro-
duced by plaintiff. While it is true, and this court has so
held in cases too numerous to cite here, that the question of
contributory negligence on the part of the plaintiff, like that
of original negligence on the part of the defendant, is ordi-
narily a question of fact for the jury, and can only in rare in-
stances be disposed of as a question of law, yet it is also true
that this court, in common with other courts, has also very
frequently held that, where the evidence is undisputed and
is not conflicting, and is such that reasonable men may not
deduce conflicting inferences therefrom or arrive at different
conclusions, then the question of necessity is purely one of law
to be determined by the court. Under the circumstances last
above stated courts may not legitimately refuse to discharge
the duty the law imposes and permit the jury to find negli-
gence where there is no evidence either direct or inferential
authorizing such a finding or to refuse to find negligence
where the evidence of negligence is clear, undisputed, and does
not admit of conflicting inferences or deductions. It, no doubt,
is the law, and we so hold, that the mere fact that a railroad
company fails to comply with its statutory duty to fence its
right of way where its track passes through the land of others,
or in case it has complied with that duty, but fails to maintain
its fences or to keep them in repair, it does not constitute con-
tributory negligence on the part of the owner to turn his live
stock into his fields adjacant to the railroad merely because
he knows that the railroad company has failed in its duty
either in constructing or in keeping the right of way fence in
repair. The same doctrine applies to gates at private cross-
ings where the statute requires the railroad company to con-
struct them for the use of such owner. If such were not the
law, railroad companies could disregard their statutory duty
with impunity, and the landowner would be guilty of contribu-
tory negligence by merely using his land. This would prevent
the landowner from making use of his own property. Such
a law would do violence to every principle of justice and right.
The cases to that effect are numerous, some of which are cited
by plaintiff's counsel. We shall not pause here to refer to

them. As stated in the beginning of this opinion, however, this case is exceptional, and if it were permitted to be governed by the general rule just stated, justice and right would also be defeated. The evidence is clear and without dispute that the plaintiff, as well as all of the owners of the horses included in the four assigned causes of action, was thoroughly familiar with the condition of the wing fence for several months before the occurrence of the accident. Indeed, the plaintiff and his two sons admitted that they knew that, if the horses that were kept in the pasture should get through the gates leading into the subway, they would pass over the prostrate wing fence, and thus go into the right of way and railroad track of the defendant. They were also informed by defendant's section foreman, as we have seen, that it was not his business to repair the wing fence. Moreover, no one had ever seen the defendant's employees repair the fence, and hence there was nothing from which plaintiff or his sons, or his two neighbors, who were familiar with the facts respecting the wing fence, could infer that the defendant would repair the wing fence. In the face of all these facts plaintiff and his sons were willing to take the chance of injury to their horses rather than go to what seems to be rather small trouble or expense in re-erecting the one wing of the fence that was washed down by the high water as hereinbefore stated. It has also frequently been held that the doctrine of contributory negligence may be applied where, under peculiar circumstances as in this case, live stock is injured or killed by passing trains, and where it is not injured or killed through the negligence of the trainmen. In reversing the judgment in a case cited by plaintiff's counsel, namely, *Nelson* v. *Wilson,* 157 Iowa, 80, 137 N. W. 1048, the Supreme Court of Iowa remanded the case with directions to apply the general principles of contributory negligence. To the same effect are the cases of *Jones* v. *Sheboygan, etc., Ry. Co.,* 42 Wis. 306; *Curry* v. *Chicago, etc., Ry. Co.,* 43 Wis. 665; *Terry* v. *New York, etc., Ry. Co.,* 22 Barb. (N. Y.) 574; *Sandusky, etc., Ry. Co.* v. *Sloan,* 27 Ohio St. 341. The case of *Terry* v. *New York, etc., Ry. Co., supra,* is, in its facts, very much like the case at bar. In that case a small gap or opening was burned

in a right of way fence. The owner of the animal, notwith-
standing that he was fully cognizant of the burned gap or
opening in the fence, which easily could have been closed, and
thus prevented injury to his horse, nevertheless took the
chance, and when his horse passed through the burned gap
onto the railroad track and was killed sued to recover its
value. In that case, as in this, the law imposed no duty on
the company to construct the fence; yet it had voluntarily
done so. Fire, however, destroyed a small portion of the fence
and caused a gap or opening through which plaintiff's horse
passed onto the railroad track as before stated. In view that
that case so clearly resembles the one at bar, we take the liberty
of quoting somewhat copiously from the court's opinion. The
court said:

"Although the defendants might have been liable to pay the owner
the damages for burning the fence, they were under no legal obligation
to repair it; nor had the owner a right to neglect or abandon the rest of
his property, and charge the defendants for all the damages he might
sustain by reason of such neglect or abandonment, until the fence was
repaired, any more than the owner of a store filled with valuable goods,
which happened to have a door or window destroyed by the carelessness
of his neighbor, might neglect and abandon his goods and suffer them
to remain in the store in the usual manner, and charge his neighbor for
all the goods which might have been taken or lost before he repaired
the store. Still the affirmative of the proposition is understood to be, in
substance, identical with that insisted upon by the appellant's council,
on the argument of this appeal.

"But a full and fatal answer to the plaintiff's action, in whatever
aspect it may be presented, is the carelessness on his part, as proved
by himself. It appeared by the testimony of his own witnesses that he
suffered his mare to run in a small pasture adjoining the railroad, and
between which and the railroad there had been no fence since the latter
part of the summer preceding, until the day she was killed on the rail-
road, which was the 8th of December. This is the case as made out by
the plaintiff, without showing any legal reason or excuse for permitting
his mare to run at large, as she did, or to run on the defendants' rail-
road, and without pretending that the defendants, their agents or ser-
vants, intentionally, willfully, or knowingly ran their engine against the
mare. It is believed that no reported case can be found giving a plain-
tiff any encouragement for maintaining an action under such circum-
stances."

It must also be remembered that under out statute (Comp.

Laws 1907, section 456x1), the duty to keep the gates in the right of way fence closed was cast on the plaintiff, and not on the defendant; the latter being the case in many jurisdictions.

In *Reid* v. *Railroad*, 39 Utah, 617, 118 Pac. 1009, we had occasion to call attention to the foregoing statute. Mr. Justice McCarty, after quoting the statute, in the course of the opinion in that case said:

"Under this statute, if the cow entered upon the right of way through the open gate, appellant cannot be held liable for her loss; there being no evidence of negligence on the part of trainmen at the time she was killed."

That case, in effect, covers the case at bar.

In the following cases it is held that under statutes like ours the duty to keep the gates closed at private crossings is cast on the landowner: *Pennsylvania Co.* v. *Spaulding*, 112 Ind. 47, 13 N. E. 268; *Adams* v. *Atchison, T. & S. F. Ry. Co.*, 46 Kan. 161, 26 Pac. 439; *Harrington* v. *Chicago, R. I. & P. Ry. Co.*, 71 Mo. 384; *Binicker* v. *Hannibal, etc., Ry. Co.*, 83 Mo. 660. In the last two cases cited it is held that, where the law imposes the duty on the landowner to keep the gates at private crossings closed, the railroad company is not liable for stock killed which come on the right of way through gates that were opened or were left open by third persons without the consent of the railroad company, and where such stock were not killed through the negligence of the trainmen. Such is necessarily the effect of the holding in *Reid* v. *Railroad, supra.*

Under the peculiar facts and circumstances of this case, all of which are without conflict or dispute, we are of the opinion that both the plaintiff and the owners of the horses included in the four assigned causes of action cannot recover, upon the ground of having been guilty of contributory negligence.

It is, however, further contended by defendant's counsel that plaintiff cannot recover in this action for the reason that, although it be conceded that defendant was guilty of negligence in failing to keep the wing fence in repair yet, such negligence was not the proximate cause of the

killing of the horses in question. It seems that under the rule laid
down by this court in the case of *Edgar* v. *Railroad,* 32 Utah,
330, 90 Pac. 745, 11 L. R. A. (N. S.) 738, 125 Am. St. Rep.
867, the contention is well founded. It requires no argument
to show that, if plaintiff had kept the gates in the right of way
fences closed, as it was his duty to do, all the horses would
have been safe, and the accident could not have happened. If,
therefore, some human agency opened the gate and left it
open, as plaintiff's son testified must have been the case, it
was the act of such third person or agency that made it pos-
sible for the horses to get out of the pasture and for the acci-
dent to happen as it did. Without the act of such agency in
leaving the gate open the condition of the wing fence was of
no consequence. So long as the gate remained closed there
was no danger. In view that the law did not impose the duty
upon the defendant either to maintain or to keep in repair the
wing fence, nor to keep the crossing gates closed, this case, in
principle, is the same as though the horses had gotten onto the
right of way and onto the railroad track through a gate which
was left open either by the plaintiff or by some one else with-
out defendant's fault or consent. In no event, therefore, can
it be said that the condition of the right of way fences was the
proximate cause of the killing of the horses. Let it be remem-
bered that, if the defendant had given the plaintiff a private
crossing without gates in the right of way fence, the case
would be different. That was not done, however. Gates were
put in by the defendant, and were always maintained in good
working condition. While, no doubt, plaintiff could have left
the gates, or any one of them, open with impunity at any time
so long as the wing fences were in good condition, yet if he
left them open when the wing fences were not in good con-
dition or were entirely down, as was the case in this instance,
he did so at his peril.

Counsel in their briefs have discussed the question of rati-
fication upon the theory that, when defendant put in the gates
and wing fences at the new crossing, it by that act ratified all
that was said to the man in the office. It is elementary that no
ratification takes place except where the alleged act which is

said to have been ratified is based upon full knowledge of the material facts. As already pointed out, there is not a scintilla of evidence in this record of what was communicated to defendant's employee or agent who ordered the gates and wing fences put in. For other reasons, however, which it is not necessary to discuss, the doctrine of ratification has no application to this case.

What we have already said also disposes of the exceptions to the instructions given, and also to those that were refused.

In closing we desire to state that we have devoted so much time and space to the discussion of the question involved in this case for three reasons: (1) Because the case presented questions that were peculiar in their nature and effect: (2) because, under our statute, in case a judgment is reversed, and the cause is remanded for a new trial, we are required to decide all material question presented by the record; and (3) because, under our Constitution, we are required to state the reasons upon which we base our decisions.

It follows from what has been said that the judgment should be, and it accordingly is, reversed; and the cause is remanded to the district court of Weber County, with directions to grant a new trial; defendant to recover costs on appeal.

McCARTY, CORFMAN, THURMAN, and GIDEON, JJ., concur.